UNITED STATES DISTRICT COURT

FOR THE EASTERN DISTRICT OF CALIFORNIA

GRUMA CORPORATION d/b/a MISSION FOODS.,

Plaintiff,

v.

MISSION FOODS CORP., TORTILLAS MISSION LLC, MARTHA SALGADO BURGOS, ELOY PENA GARZA, and DOES1-10,

Defendants.

No. 2:25-cv-3036 TLN AC

FINDINGS AND RECOMMENDATIONS

This matter is before the court on plaintiff's motion for default judgment against defendants. ECF No. 30. The motion was referred to the undersigned pursuant to E.D. Cal. R. 302(c)(19). For the reasons set forth below, the undersigned recommends that the motion be GRANTED and that judgment be entered in favor of plaintiff on the terms described below.

## I. Allegations of the Complaint

Plaintiff Gruma Corporation, doing business as Mission Foods ("Mission Foods" or "Plaintiff"), is suing defendants Mission Foods Corp. ("Mission Foods Corp."), Tortillas Mission LLC ("Tortillas Mission"), Martha Salgado Burgos ("Salgado Burgos"), and Eloy Pena Garza ("Pena Garza") (collectively "defendants") for trademark infringement, unfair competition, and trademark dilution. ECF No. 1 at 2.

A. Plaintiff's MISSION Trademarks

MISSION brand food products are one of the leaders in grocery store sales in the Mexican food products category in the United States. ECF No. 1 at 4. MISSION brand tortillas hold approximately a 40% market share in the U.S. tortilla industry. Id. The labels and packaging for MISSION brand food products usually feature a design element depicting a bell and a bell tower, recognizable as being in the style of a Spanish mission. Id. Plaintiff's MISSION marks are well known to the purchasers of tortillas, tortilla chips, and other Mexican food products in the United States. Id. Plaintiff is the owner of a family of federally registered trademarks for the word MISSION and MISSION and Design, and registration numbers are included in the complaint. Id. at 5.

B. Defendant Mission Food Corp.'s Alleged Infringement

In May of 2025, long after plaintiff, its predecessors, and related companies had started using the MISSION marks and established the MISSION brand for Mexican food products, defendant Mission Foods Corp. registered a California corporation using the name Mission Foods Corp. with its principal place of business in Sacramento, California, and with Defendant Salgado Burgos registered as the Chief Executive Officer and Chief Financial Officer. Id. at 10. On May 20, 2025, defendant Salgado Burgos filed a California Statement of Information Corporation for Defendant Mission Foods Corp., in which the Type of Business was identified as "Manufacture, distribution and sale of all corn and flour products." ECF No. 1 at Exhibit 1. On April 29, 2025, Defendant Mission Foods Corp., or someone acting on its behalf, registered the domain name "Missionfoods.org." ECF No. 1 at 11. A true and correct copy of the registration is located at ECF No. 1, Exhibit 5. Defendant Mission Foods Corp. uses an email domain "@missionfoods.org" to offer and sell its items in the United States. ECF No. 1 at 11.

In 2025, plaintiff became aware of defendant Mission Foods Corp. and its use of the MISSION marks, and on May 30, 2025, plaintiff sent a cease-and-desist letter to Mission Foods Corp. to cease use of all infringing marks and to dissolve defendant Mission Foods Corp. Id. at 12. Defendant Mission Foods Corp. never responded. Id. Plaintiff believes that defendant Mission Foods Corp. has continued to offer to sell food items in the United States using the

MISSION marks after receiving Plaintiff's cease and desist letter. Id.

C. Defendant Tortillas Mission LLC's Alleged Infringement

On September 30, 2022, defendant Salgado Burgos registered a Texas Limited Liability Company under the name "Tortillas Mission LLC" listing defendants Salgado Burgos and Pena Garza as managing members. ECF No. 1 at 12. A copy of the certificate of formation is attached to the complaint as Exhibit 2. On October 26, 2022, defendant Pena Garza registered Tortillas Mission LLC with the California Secretary of State as an out of state Limited Liability Corporation; a copy of the registration is attached to the complaint as Exhibit 4. Defendants Salgado Burgos and Pena Garza are managing members of defendant Tortillas Mission LLC and are responsible for and direct its activities. ECF No. 1 at 12. Tortillas Mission LLC currently operates its website "tortillasmission.com" and currently uses the MISSION logo as depicted in the complaint to offer and sell Mexican food items in the United States.

Plaintiffs are suing all defendants for (1) Trademark Infringement in violation of 15 U.S.C. § 1114; (2) False Designation of Origin in violation of 15 U.S.C. §1126(A)(1)(A); (3) Trademark Dilution in violation of 15 U.S.C. § 1125(C); (3) Common Law Trademark Infringement and Unfair Competition; (4) Unfair Competition; and (5) Cybersquatting in violation of 15 U.S.C. §1125, against the corporate defendants only. ECF No. 12 at 13-19.

## II. Procedural History

The complaint was filed on October 17, 2025. ECF No. 1. Default was entered against Mission Foods Corp. and Tortillas Mission LLC on December 3, 2025. ECF No. 16. Default was entered against Martha Salgado Burgos and Eloy Pena Garza on April 29, 2026. ECF No. 28. A consolidated motion for default judgment against all defendants was filed on May 11, 2026. ECF No. 30.

## III. Motion

Plaintiff seeks judgment against defendants in the amount of $125,000 from Defendant Mission Foods Corp and $60,000 from Defendant Tortillas Mission, along with injunctive relief. ECF No. 30-9 at 2.

////

## IV. Analysis

A. Legal Standard

Pursuant to Federal Rule of Civil Procedure 55, default may be entered against a party against whom a judgment for affirmative relief is sought who fails to plead or otherwise defend against the action. See Fed. R. Civ. P. 55(a). However, "[a] defendant's default does not automatically entitle the plaintiff to a court-ordered judgment." PepsiCo, Inc. v. Cal. Sec. Cans, 238 F.Supp.2d 1172, 1174 (C.D. Cal. 2002) (citing Draper v. Coombs, 792 F.2d 915, 924-25 (9th Cir. 1986)); see Fed. R. Civ. P. 55(b) (governing the entry of default judgments). Instead, the decision to grant or deny an application for default judgment lies within the district court's sound discretion. Aldabe v. Aldabe, 616 F.2d 1089, 1092 (9th Cir. 1980). In making this determination, the court may consider the following factors:

> (1) the possibility of prejudice to the plaintiff; (2) the merits of plaintiff's substantive claim; (3) the sufficiency of the complaint; (4) the sum of money at stake in the action; (5) the possibility of a dispute concerning material facts; (6) whether the default was due to excusable neglect; and (7) the strong policy underlying the Federal Rules of Civil Procedure favoring decisions on the merits.

Eitel v. McCool, 782 F.2d 1470, 1471-72 (9th Cir. 1986). Default judgments are ordinarily disfavored. Id. at 1472.

As a general rule, once default is entered, well-pleaded factual allegations in the operative complaint are taken as true, except for those allegations relating to damages. TeleVideo Sys., Inc. v. Heidenthal, 826 F.2d 915, 917-18 (9th Cir. 1987) (per curiam) (citing Geddes v. United Fin. Group, 559 F.2d 557, 560 (9th Cir. 1977) (per curiam)); see also Fair Housing of Marin v. Combs, 285 F.3d 899, 906 (9th Cir. 2002). Although well-pleaded allegations in the complaint are admitted by a defendant's failure to respond, "necessary facts not contained in the pleadings, and claims which are legally insufficient, are not established by default." Cripps v. Life Ins. Co. of N. Am., 980 F.2d 1261, 1267 (9th Cir. 1992) (citing Danning v. Lavine, 572 F.2d 1386, 1388 (9th Cir. 1978)); accord DIRECTV, Inc. v. Huynh, 503 F.3d 847, 854 (9th Cir. 2007) ("[A] defendant is not held to admit facts that are not well-pleaded or to admit conclusions of law") (citation and quotation marks omitted); Abney v. Alameida, 334 F.Supp.2d 1221, 1235 (S.D. Cal.

2004) ("[A] default judgment may not be entered on a legally insufficient claim."). A party's default conclusively establishes that party's liability, although it does not establish the amount of damages. Geddes, 559 F.2d at 560; cf. Adriana Int'l Corp. v. Thoeren, 913 F.2d 1406, 1414 (9th Cir. 1990) (stating in the context of a default entered pursuant to Federal Rule of Civil Procedure 37 that the default conclusively established the liability of the defaulting party).

B. The Eitel Factors

1. Factor One: Possibility of Prejudice to Plaintiff

The first Eitel factor considers whether the plaintiff would suffer prejudice if default judgment is not entered, and such potential prejudice to the plaintiff weighs in favor of granting a default judgment. See PepsiCo, Inc., 238 F.Supp.2d at 1177. Here, plaintiff would suffer prejudice if the court did not enter a default judgment because they would be without recourse for recovery. Defendants have not appeared or participated in this case. Accordingly, the first Eitel factor favors the entry of default judgment.

2. Factors Two and Three: Merits of Claims and Sufficiency of Complaint

The merits of plaintiffs' substantive claims and the sufficiency of the complaint are considered here together because of the relatedness of the two inquiries. The court must consider whether the allegations in the complaint are sufficient to state a claim that supports the relief sought. See Danning, 572 F.2d at 1388; PepsiCo, Inc., 238 F.Supp.2d at 1175. Here, the merits of the claims and sufficiency of the complaint favor entry of default judgment.

a. Trademark infringement

Plaintiff's causes of action for Federal Trademark Infringement, False Designation of Origin, Unfair Competition under Cal. Bus. & Prof. Code § 17200, and Common Law Trademark infringement and Unfair Competition are analyzed under the same test for federal trademark infringement because they all go to the essential question of likelihood of confusion. See Jada Toys, Inc. v. Mattel, Inc., 518 F.3d 628, 632 (9th Cir. 2008). To state a claim for trademark infringement, the complaint must allege that the plaintiff "(1) ...has a protectable ownership interest in the mark; and (2) that the defendant's use of the mark is likely to cause consumer confusion, thereby infringing upon the [plaintiff's] rights to the mark." Department of Parks and

Recreation for State of California v. Bazaar Del Mundo Inc., 448 F.3d 1118, 1124 (9th Cir. 2006); see also Multi Time Machine, Inc. v. Amazon.com, Inc., 804 F.3d 930, 935 (9th Cir. 2015) ("To prevail on a claim of trademark infringement under the Lanham Act, a trademark holder must show that the defendant's use of its trademark is likely to cause confusion, or to cause mistake, or to deceive."). "The test for likelihood of confusion is whether a 'reasonably prudent consumer' in the marketplace is likely to be confused as to the origin of the good or service bearing one of the marks." Dreamwerks Production Group, Inc. v. SKG Studio, 142 F.3d 1127, 1129 (9th Cir. 1998). In evaluating the likelihood of confusion, the court employs an eight factor test. See AMF Inc. v. Sleekcraft Boats, 599 F.2d 341, 348-49 (9th Cir. 1979), abrogated on other grounds by Mattel, Inc. v. Walking Mountain Prod., 353 F.3d 792, 810 n.19 (9th Cir. 2003).

Here, plaintiff has made the requisite allegation of protectable ownership in its complaint and supported the allegation with sufficient evidence. Plaintiffs have provided the registrations for each infringed trademark in the body of the complaint and in attachments. This uncontested proof of registration establishes plaintiff's protected ownership interest. See Pom Wonderful LLC v. Hubbard, 775 F.3d 1118, 1124 (9th Cir. 2014). Plaintiff also successfully addresses each factor of the Sleekcraft test for likelihood of confusion: (i) strength of the mark; (ii) proximity of the goods; (iii) similarity of the marks; (iv) evidence of actual confusion; (v) marketing channels used; (vi) type of goods and degree of care likely to be exercised by the purchaser; (vii) defendant's intent in selecting the mark; and (viii) likelihood of expansion of the product lines. See Sleekcraft, 599 F.3d at 348-49. The court now addresses these factors in turn.

*(i) Strength of the mark*

A "strong," or distinctive, mark is afforded greater protection under trademark law than a mark that is not strong. See, e.g., Sutter Home Winery, Inc. v. Madrona Vineyards, L.P., No. C 05-0587 MHP, 2005 WL 701599, *8 (N.D. Cal. Mar. 23, 2005) ("The strength of protection afforded to a trademark is proportionate to the likelihood that the public will remember the mark and associate it with the source of the trademarked goods" (citations omitted)). When evaluating the strength of a mark, courts consider both conceptual and commercial strength. Id.

The conceptual strength of a mark "is determined by its placement on a continuum of

marks from 'generic,' afforded no protection; through 'descriptive' or 'suggestive,' given moderate protection; to 'arbitrary' or 'fanciful' awarded maximum protection." E. & J. Gallo Winery, 967 F.2d at 1291 (quoting Nutri/System, Inc. v. Con-Stan Industries, Inc., 809 F.2d 601, 605 (9th Cir. 1987) (quotation marks omitted)). The nature of a mark is determined by the "imagination test" and a "need test." Id. (citing Earthquake Sound Corp. v. Bumper Industries, 352 F.3d 1210, 1221 n. 4 (9th Cir. 2003)). Using the "imagination test" the court asks how much imagination a consumer must use to associate a given mark with the goods or services it identifies, and using the "need test" the court examines the extent to which competitors need a mark to identify their goods or services. Earthquake Sound Corp., 352 F.3d at 1221 n. 4 (quoting Miss World (UK) Ltd. v. Mrs. America Pageants, Inc., 856 F.2d 1445, 1449 (9th Cir. 1988)).

Conceptually, the Mission Marks are arbitrary and distinctive featuring the word Mission, a red bell inside a yellow belltower in a yellow Spanish mission, and red background with a yellow border to the text. ECF ECF No. 30-1- at 13-15. The marks are accordingly entitled to significant protection, and this factor weighs in favor of finding a likelihood of confusion.

*(ii) Proximity of the goods*

Plaintiff and defendants are each using the Marks at issue to market Mexican food products, including tortillas; the products are extremely similar. This factor weighs heavily in favor of finding a likelihood of confusion.

*(iii) Similarity of the marks*

The "similarity of the marks" portion of the Sleekcraft test "is the most crucial factor in determining the likelihood of confusion." Sutter Home Winery, Inc., 2005 WL 701599 at *5. Here, as discussed above and as is apparent from the Marks pictured in the exhibits to the complaint, defendants are using near replicas of the marks at issue. This factor weighs strongly in favor of finding a likelihood of confusion.

*(iv) Evidence of actual confusion*

While evidence of actual confusion is not necessary to prevail on an infringement claim or to secure injunctive relief, it can provide persuasive evidence that future confusion is likely. See Academy of Motion Picture Arts & Sciences v. Creative House Promotions, Inc., 944 F.2d 1446,

1456 (9th Cir. 1991). Plaintiff has not submitted evidence of actual confusion, nor demonstrated a risk of future confusion. This factor weighs only slightly against finding a likelihood of confusion.

*(v) Marketing channels used*

Both plaintiffs and defendants advertise and apparently conduct their business both online and in retail spaces. "In the Internet context, in particular, entering a web site takes little effort—usually one click from a linked site or a search engine's list; thus, Web surfers are more likely to be confused as to the ownership of a web site than traditional patrons of a brick-and-mortar store would be of a store's ownership." Brookfield Commc'ns, Inc. v. W. Coast Entm't Corp., 174 F.3d 1036, 1057 (9th Cir. 1999). The extent of actual marketing channel overlap is not clear from the briefing, though the fact that at least a portion of business is conducted online for all parties indicates there is at least some overlap. This factor weighs in favor of finding a likelihood of confusion.

*(vi) Type of goods and degree of care likely to be exercised by the purchase*

As to the sixth factor, the type of goods are inexpensive food products which makes it more likely that customers will be confused. Pom Wonderful LLC v. Hubbard, 775 F.3d 1118, 1127 (9th Cir. 2014) ("Unlike purchasers of expensive goods—whom we expect to be more discerning and less easily confused—purchasers of inexpensive goods 'are likely to exercise less care, thus making confusion more likely.'") (internal citation omitted).

*(vii) Defendant's intent in selecting the mark*

As to the seventh factor of intent, defendant Mission Foods acted willfully and intentionally in committing the alleged infringement; evidencing its willfulness, defendant Mission Foods continued its conduct unabated after receiving plaintiff's cease and desist letter. See Razor USA LLC v. Vizio, Inc., No. 14-cv-01586, 2015 WL 12656941, at *6 (C.D. Cal. Oct. 19, 2015) ("Use of an infringing mark, in the face of warnings about potential infringement, is strong evidence of willful infringement.") (citing E. & J. Gallo Winery v. Consorzio del Gallo Nero, 782 F. Supp. 472, 475 (N.D. Cal. 1992). This factor favors finding a likelihood of confusion.

*(viii) Likelihood of expansion of product lines*

This factor evaluates whether a parties' product line is likely to expand to create competition; where the parties are already in direct competition with one another, this factor is not relevant. See, e.g., Au-Tomotive Gold, Inc. v. Volkswagen of America, Inc., 457 F.3d 1062, 1078 n. 12 (9th Cir. 2006) ("The final factor, '[a] likelihood of expansion in product lines,' warrants no discussion as it is 'relatively unimportant where two companies already compete to a significant extent,' " quoting Brookfield Communications, 174 F.3d at 1060)).

*(ix) Conclusion as to Sufficiency and Merits of Trademark Infringement Claim*

Based on a review of the entire record, the court finds that plaintiff has demonstrated protectable ownership in the marks and a likelihood of confusion stemming from defendant's unauthorized use. Accordingly, the second and third Eitel factors are satisfied as to the claim of trademark infringement.

b. Trademark Dilution

To prevail on a federal trademark dilution claim, plaintiff must prove that the Mission Marks are famous and distinctive, that defendants started using the marks in commerce after plaintiff's Mission Marks became famous, and that defendants' acts present a likelihood of dilution of plaintiff's Mission Marks. Perfumebay.com Inc. v. eBay, Inc., 506 F.3d 1165, 1180 (9th Cir. 2007); Levi Strauss & Co. v. Abercrombie & Fitch Trading Co., 633 F.3d 1158, 1168 (9th Cir. 2011).

Plaintiff's allegations, taken as true for purposes of liability, establish all the elements of trademark dilution under 15 U.S.C. § 1125(c). Mission Marks are famous and distinctive as a result of long-term use and reputation. ECF No. 30-1 at Ex. 1 at ¶¶ 1, 11-12, 41. The Mission Marks were famous before defendants incorporated and began using counterfeit or substantially similar marks. Id. at ¶¶ 49-53. The marks used by defendants are nearly identical to the Mission Marks, which creates a likelihood of dilution. See Perfumebay.com, 506 F.3d at 1180. Accordingly, plaintiff's allegations satisfy the second and third Eitel factors as to this claim.

////

////

c. Cybersquatting

To prevail on a claim for cybersquatting, plaintiff must prove that "(1) the defendant registered, trafficked in, or used a domain name; (2) the domain name is identical or confusingly similar to a protected mark owned by the plaintiff; and (3) the defendant acts with 'bad faith intent to profit from that mark.'" DSPT Int'l, Inc. v. Nahum, 624 F.3d 1213, 1218–19 (9th Cir.2010) (quoting 15 U.S.C. § 1125(d)(1)(A)). Here, defendant Mission Foods Corp registered the "Missionfood.org" domain name and uses the email domain "@missionfood.org" to offer for sale Mexican food products. ECF No. 30-1 at Ex. 1 at ¶¶ 16-18. "Missionfood.org" is identical to the Mission Marks, and the email domain "@missionfood.org" is used to create the impression that defendant Mission Foods Corp is a legitimate source for plaintiff's products. Mission Foods Corp. has not denied or refuted plaintiff's allegations in the complaint. Moreover, defendant Mission Foods Corp continues to use the "@missionfood.org" domain name even after plaintiff sent a cease-and-desist letter, further demonstrating bad faith. Accordingly, plaintiff's allegations sufficiently support liability for cyberstalking in the default judgment context. See Wecosign, Inc. v. IFG Holdings, Inc., 845 F. Supp. 2d 1072, 1080 (C.D. Cal. 2012) (granting default judgment award for cyberpiracy claim based on finding that plaintiff's complaint adequately alleged claim's necessary elements).

3. Factor Four: The Sum of Money at Stake in the Action

Under the fourth Eitel factor, the court considers the amount of money at stake in relation to the seriousness of defendant's conduct. Here, plaintiff seeks statutory damages and injunctive relief. The Lanham Act authorizes statutory damages of up to $2 million per mark for willful trademark infringement and up to $100,000 per instance of cybersquatting. 15 U.S.C. § 1117(c) and (d), respectively. Plaintiff requests a total of $125,000 from defendant Mission Foods Corp and $60,000 from defendant Tortillas Mission for defendants' willful infringement of the Mission Marks and cybersquatting violations. The amount at issue is proportionate to the seriousness of defendant's conduct and this factor favors entry of default judgment.

4. Factor Five: Possibility of Dispute Concerning Material Facts

The facts of this case are relatively straightforward, and plaintiff has provided the court

with well-pleaded allegations supporting its claims and affidavits and exhibits in support of those allegations. Here, the court may assume the truth of well-pleaded facts in the complaint (except as to damages) following the clerk's entry of default and, thus, there is no likelihood that any genuine issue of material fact exists. See, e.g., Elektra Entm't Group Inc. v. Crawford, 226 F.R.D. 388, 393 (C.D. Cal. 2005) ("Because all allegations in a well-pleaded complaint are taken as true after the court clerk enters default judgment, there is no likelihood that any genuine issue of material fact exists."); accord Philip Morris USA, Inc., 219 F.R.D. at 500; PepsiCo, Inc., 238 F.Supp.2d at 1177.

5. Factor Six: Whether Default Was Due to Excusable Neglect

Upon review of the record before the court, there is no indication that the default was the result of excusable neglect. See PepsiCo, Inc., 238 F.Supp.2d at 1177. Defendants were served and the Clerk of Court entered default against them. ECF Nos. 16, 28. The motion for default judgment was served on defendants. ECF No. 30-2 at 2. Accordingly, this Eitel factor favors the entry of a default judgment.

6. Factor Seven: Policy Favoring Decisions on the Merits

"Cases should be decided upon their merits whenever reasonably possible." Eitel, 782 F.2d at 1472. However, district courts have concluded with regularity that this policy, standing alone, is not dispositive, especially where a defendant fails to appear or defend itself in an action. PepsiCo, Inc., 238 F.Supp.2d at 1177; see also Craigslist, Inc. v. Naturemarket, Inc., 694 F.Supp.2d 1039, 1061 (N.D. Cal. Mar. 5, 2010). Accordingly, although the court is cognizant of the policy favoring decisions on the merits – and consistent with existing policy would prefer that this case be resolved on the merits – that policy does not, by itself, preclude the entry of default judgment.

7. Conclusion: Propriety of Default Judgment

Upon consideration of all the Eitel factors, the court concludes that plaintiff is entitled to the entry of default judgment against the corporate defendant. What remains is the determination of the amount of damages to which plaintiff is entitled.

////

C. Terms of Judgment

1. Injunctive Relief

Plaintiffs' motion for default judgment includes a request for a permanent injunction. ECF No. 30-1 at 25. 15 U.S.C. § 1116(a) provides that a district court has the "power to grant injunctions, according to the principles of equity and upon such terms as the court deems reasonable, to prevent the violation of any right of the registrant of a mark registered in the Patent and Trademark Office." A permanent junction may be granted where the plaintiff demonstrates: "(1) that it has suffered an irreparable injury; (2) that remedies available at law, such as monetary damages, are inadequate to compensate for that injury; (3) that, considering the balance of hardships between the plaintiff and defendant, a remedy in equity is warranted; and (4) that the public interest would not be disserved by a permanent injunction." eBay Inc. v. MercExchange, L.L.C., 547 U.S. 388, 391 (2006).

"Injunctive relief is the remedy of choice for trademark and unfair competition cases, since there is no adequate remedy at law for the injury caused by a defendant's continuing infringement." Century 21 Real Estate Corp. v. Sandlin, 846 F.2d 1175, 1180 (9th Cir. 1988). Moreover, "once the plaintiff establishes a likelihood of confusion, it is ordinarily presumed that the plaintiff will suffer irreparable harm if injunctive relief is not granted." Vision Sports, Inc. v. Melville Corp., 888 F.2d 609, 612 n.3 (9th Cir. 1989). And "the public has an interest in the enforcement of federal statutes." CoxCom, Inc. v. Chaffee, 536 F.3d 101, 112 (1st Cir. 2008). Because there is no hardship to the defendant in enjoining defendant from using infringing marks, the court recommends that plaintiffs be awarded a permanent injunction.

2. Trademark Violation Statutory Damages

Plaintiffs also seek an award of statutory damages under the Lanham Act. Under the Lanham Act, a court may award statutory damages in an amount of "not less than $1,000 or more than $200,000 per counterfeit mark per type of goods or services sold, offered for sale, or distributed, as the court considers just." Id. § 1117(c)(1). "[I]f the court finds that the use of the counterfeit mark was willful, [the Court may award] not more than $2,000,000 per counterfeit mark per type of goods or services sold, offered for sale, or distributed, as the court considers

just." Id. § 1117(c)(2). "In determining the appropriate amount of statutory damages to award on default judgment, courts in this district have considered whether the amount of damages requested bears a plausible relationship to [a p]laintiff's actual damages." Yelp Inc. v. Catron, 70 F. Supp. 3d 1082, 1102 (N.D. Cal. 2014) (internal quotation marks and citations omitted). "While a plaintiff in a trademark or copyright infringement suit is entitled to damages that will serve as a deterrent, it is not entitled to a windfall." Id.

For cybersquatting, Plaintiffs can be awarded between $1,000 and $100,000 per domain name, as the court considers just. 15 U.S.C. § 1117(d). To determine cybersquatting statutory damages in the default judgment context , "courts generally consider a number of factors ... including the egregiousness or willfulness of the defendant's cybersquatting, the defendant's use of false contact information to conceal its infringing activities, the defendant's status as a "serial" cybersquatter—i.e., one who has engaged in a pattern of registering and using a multitude of domain names that infringe the rights of other parties—and other behavior by the defendant evidencing an attitude of contempt towards the court or the proceedings. Digby Adler Grp. LLC v. Image Rent a Car, Inc., 79 F. Supp. 3d 1095, 1108 (N.D. Cal. 2015) (citation omitted); see 15 U.S.C. § 1125(d)(1)(B) (listing factors that a court may consider in determining bad faith intent).

Plaintiff seeks statutory damages of $25,000 against defendant Mission Foods Corp and $10,000 against defendant Tortillas Mission for cybersquatting. ECF No. 30-1 at 25. Plaintiff seeks $100,000 from defendant Mission Foods Corp and $50,000 from defendant Tortillas Mission for trademark infringement, which amounts to less than 1% of the recoverable damages. Based on the totality of the circumstances of this case, the undersigned finds that plaintiff's requested amount is appropriate.

## V. Conclusion

It is hereby RECOMMENDED THAT:

1. Plaintiffs' motion for default judgment (ECF No. 30) be GRANTED;
2. That Judgment be entered in favor of plaintiff in the total amount of $125,000 from defendant Mission Foods Corp and $60,000 from defendant Tortillas Mission;
3. That defendants, their officers, agents, servants and employees and any persons in

active concert or participation with them are permanently restrained and enjoined from infringing upon plaintiff's federally registered trademarks, including but not limited to the Mission Marks, and from unfairly competing with plaintiff, either directly or contributorily in any manner;

4. That defendant Mission Foods Corp is to transfer the "missionfood.org" domain names to plaintiff and to deregister its entity registrations with the California Secretary of State within 14 days of a final order in this case; and

5. That defendant Tortillas Mission LLC is to transfer the "tortillasmission.com" domain names to plaintiff and to deregister its entity registrations with the Texas and California Secretaries of State within 14 days of this Order

These findings and recommendations are submitted to the United States District Judge assigned to the case, pursuant to the provisions of 28 U.S.C. § 636(b)(1). Within twenty one days after being served with these findings and recommendations, any party may file written objections with the court and serve a copy on all parties. Id.; see also Local Rule 304(b). Such a document should be captioned "Objections to Magistrate Judge's Findings and Recommendations." Any response to the objections shall be filed with the court and served on all parties within fourteen days after service of the objections. Local Rule 304(d). Failure to file objections within the specified time may waive the right to appeal the District Court's order. Turner v. Duncan, 158 F.3d 449, 455 (9th Cir. 1998); Martinez v. Ylst, 951 F.2d 1153, 1156-57 (9th Cir. 1991).

DATED: July 29, 2026

Allison Claire

ALLISON CLAIRE
UNITED STATES MAGISTRATE JUDGE